

1  JASON M. FRIERSON
   United States Attorney
2  District of Nevada
   Nevada Bar Number 7709
3  KIMBERLY M. FRAYN
   Assistant United States Attorney
4  501 Las Vegas Boulevard South, Suite 1100
   Las Vegas, Nevada 89101
5  Tel: (702) 388-6336
   Kimberly.Frayn@usdoj.gov
6  *Attorneys for the United States of America*

7              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEVADA
8

9  UNITED STATES OF AMERICA,              No. 2:23-cr-00214-CDS-BNW

10            Plaintiff,
                                          **Plea Agreement for Defendant**
11         v.                             **Arian Anthony Bailey Pursuant to**
                                          **Fed. R. Crim. P. 11(c)(1)(A) and (B)**
   ARIAN ANTHONY BAILEY,
12
              Defendant.
13

14         This plea agreement between Arian Anthony Bailey ("defendant") and the United

15  States Attorney's Office for the District of Nevada (the "USAO") sets forth the parties'

16  agreement regarding the criminal charges referenced herein and the applicable sentences,

17  fines, and restitution in the above-captioned case. This agreement binds only defendant and

18  the USAO and does not bind the district court, the U.S. Probation Office, or any other

19  federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory

20  authorities. This agreement does not prohibit the USAO or any agency or third party from

21  seeking any other civil or administrative remedies, including administrative forfeiture or

22  civil forfeiture *in rem* actions, directly or indirectly against defendant or defendant's

23  property.

24

This agreement becomes effective upon signature by defendant, defendant's counsel, and an Assistant United States Attorney.

## I. DEFENDANT'S OBLIGATIONS

1.     Defendant agrees to:

   a.     Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a one-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Wire Fraud, in violation of 18 U.S.C. § 1343;

   b.     Stipulate to the facts agreed to in this agreement;

   c.     Abide by all agreements regarding sentencing contained in this agreement;

   d.     Not seek to withdraw defendant's guilty plea once it is entered;

   e.     Appear and admit to violating the conditions of his supervised release and agree to the revocation of his release in case number 2:21-cr-00208-GMN-DJA, if and when United States Probation files a petition or an addendum seeking revocation as a result of the facts agreed to in this agreement;

   f.     Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter;

   g.     Not commit any federal, state, or local crime;

   h.     Be truthful at all times with the U.S. Probation and Pretrial Services Offices and the Court;

   i.     Before and after sentencing, upon request by the Court, the USAO, or the Probation Office, provide accurate and complete financial information, submit sworn

1     statements, and/or give depositions under oath concerning defendant's assets and

2     defendant's ability to pay. As part of the required disclosure, defendant agrees to provide

3     any and all financial information and authorizations requested by the Probation Office for

4     preparation of the Presentence Report. Defendant further agrees that, upon filing of this

5     agreement, the USAO is authorized to obtain defendant's credit report. Defendant will also

6     complete a financial form provided by the USAO, to include all supporting documentation,

7     and return it to the USAO within ten (10) days from entry of the plea. Defendant agrees that

8     the district court may enter any order necessary to effectuate or facilitate disclosure of

9     defendant's financial information;

10           j.       To facilitate payment of any fine, restitution, or assessment, surrender

11     assets defendant obtained directly or indirectly as a result of defendant's crimes. Defendant

12     agrees to voluntarily release funds and property under defendant's control or in which

13     defendant has any property interest, before and after sentencing, to pay any fine or

14     restitution identified in this agreement, agreed to by the parties, or ordered by the Court;

15           k.       Defendant agrees that restitution shall be ordered due and payable in

16     full immediately after the judgment is entered, and that the full amount of any restitution

17     ordered is subject to immediate enforcement and collection by the USAO or defendant's

18     victims, or both. Defendant agrees that any schedule of payments entered by the district

19     court is a schedule of the minimum payment due and does not prohibit or limit the methods

20     by which the USAO may immediately enforce and collect the judgment in full. Defendant

21     acknowledges that restitution may not be discharged, in whole or in part, in any present or

22     future bankruptcy proceeding.

23           l.       Defendant agrees to admit to violating the conditions of his supervised

24     release in case number 2:21-cr-00208-GMN-DJA as alleged in: (i) ECF 28 Petition for

1  Warrant for Offender Under Supervision paragraphs1A, 1B, and 1C; and (ii) paragraphs

2  2A, 2B, 3, and 4 in the August 14, 2023 Addendum. Defendant will further agree that his

3  supervised release in case number 2:21-cr-00208-GMN-DJA should be revoked.

## II. THE USAO'S OBLIGATIONS

5      2.    The USAO agrees to:

6          a.    Stipulate to facts agreed to in this agreement;

7          b.    Abide by all agreements regarding sentencing contained in this

8  agreement;

9          c.    At sentencing, provided that defendant demonstrates an acceptance of

10  responsibility for the offense up to and including the time of sentencing, recommend a two-

11  level reduction in the applicable sentencing guidelines offense level, pursuant to USSG

12  § 3E1.1, and move for an additional one-level reduction if available under that section;

13          d.    Not bring any additional charges against defendant arising out of the

14  investigation in the District of Nevada which culminated in this agreement and based on

15  conduct known to the USAO. However, the USAO reserves the right to prosecute

16  defendant for (a) any crime of violence as defined by 18 U.S.C. § 16; and (b) any criminal

17  tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C.

18  § 371). Defendant agrees that the district court at sentencing may consider any uncharged

19  conduct in determining the applicable sentencing guidelines range, the propriety and extent

20  of any departure from that range, and the sentence to be imposed after consideration of the

21  sentencing guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

## III. ELEMENTS OF THE OFFENSE

23      3.    Count One: The elements of wire fraud under 18 U.S.C. § 1343 are as

24  follows:

First:        Defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, promises or ommitted facts.

Second:        The statements made or facts ommitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property.

Third: Defendant acted with the intent to defraud, that is, the intent to deceive and cheat.

Fourth:        Defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

*See* Ninth Circuit Model Criminal Jury Instruction 15.35 (rev. Aug. 2023).

## IV. CONSEQUENCES OF CONVICTION

4.        Maximum Statutory Penalties:

        a.        Defendant understands that the statutory maximum sentence the district court can impose for a violation of 18 U.S.C. § 1343 as charged in Count One is: 20 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

        b.        In case number 2:21-cr-00208-GMN-DJA, upon revocation of supervised release for a class A felony, the Court can impose up to 60 months in custody.

5.        Restitution: Defendant understands that defendant will be required to pay full restitution to the victims of the offense to which defendant is pleading guilty. Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victims of the offense to which

5

defendant is pleading guilty and in amounts greater than those alleged in the counts to which defendant is pleading guilty. In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in USSG § 1B1.3, in connection with the offense to which defendant is pleading guilty; and (b) any charges not prosecuted pursuant to this agreement as well as all relevant conduct, as defined in USSG § 1B1.3, in connection with those charges. The parties currently believe that the applicable amount of restitution is approximately $47,000 but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

7.   <u>Parole Abolished</u>: Defendant acknowledges that defendant's prison sentence cannot be shortened by early release on parole because parole has been abolished.

8.   <u>Supervised Release</u>: Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

9.   <u>Factors under 18 U.S.C. § 3553</u>: Defendant understands that the district court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining defendant's sentence. However, the statutory maximum sentence limits the district court's discretion in determining defendant's sentence.

10.   <u>Potential Collateral Consequences of Conviction</u>: Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and

6

valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the district court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

11.    Potential Removal/Deportation Consequences of Conviction: Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future. The district court cannot advise defendant fully regarding the immigration consequences of the felony conviction in this case, but defendant's attorney has advised him about the deportation risks of his guilty plea. Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty plea.

## V. FACTUAL BASIS

12.    Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty. Defendant acknowledges that if defendant elected to go to trial instead of pleading guilty, the USAO could prove defendant's guilt beyond a reasonable doubt. Defendant further acknowledges that defendant's admissions and declarations of fact set forth below satisfy every element of the charged offense. Defendant waives any potential future claim that the facts defendant admitted below are insufficient to

1  satisfy the elements of the charged offense. Defendant admits and declares under penalty of

2  perjury that the facts set forth below are true and correct:

3  **I.      Count One (Wire Fraud):**

4                                                   Introduction

5                    a.      At all times relevant to the Wire Fraud scheme, defendant Arian

6  Anthony Bailey ("Bailey") was a United States citizen residing in Las Vegas, Nevada.

7                    b.      In June 2016, Bailey was arrested by state law enforcement. In August

8  2016, Bailey was indicted on felony drug and gun offense, in *United States v. Arian Bailey*,

9  case number 16CR520-1, in the United States District Court for the Northern District of

10  Illinois. In February 2017, Bailey was convicted of several federal felonies, including one

11  Class A felony, and he was sentenced to imprisonment. Bailey remained in continuous

12  custody until he was released to the residential re-entry center in Las Vegas, Nevada, in

13  December 2020.

14                    c.      Bailey was also ordered to serve three years of supervised release as

15  part of his 2017 sentence.  Bailey commenced supervision in Nevada on April 30, 2021.

16  Bailey is currently under United States Probation's supervision, in case number 2:21-cr-

17  00208-GMN-DJA, after jurisdiction was transferred from Illinois to Nevada in July 2021.

18                    d.      Institution 1 was a non-bank lender headquartered in Lake Mary,

19  Florida. Institution 2 was a commerce platform that provided apps, APIs, marketing, and

20  financial tools to help businesses. Institution 1 partnered with Institution 2 to participate as

21  a lender in the Paycheck Protection Program ("PPP").

22                    e.      Institution 3 was a hard money lender headquartered in Coral Gables,

     Florida. Institution 3 participated as a PPP lender.

23

24

1                        Background Regarding the Paycheck Protection Program

2              f.       The Coronavirus Aid, Relief, and Economic Security ("CARES") Act

3      is a federal law enacted in or around March 2020 and is designed to provide emergency

4      financial assistance to the millions of Americans who are suffering the economic effects

5      caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was

6      the authorization of up to $349 billion in forgivable loans to small businesses and sole

7      proprietorships for job retention and certain other expenses, through a program referred to

8      as the Paycheck Protection Program ("PPP"). Subsequent legislation provided additional

9      funding for the PPP and extended its duration. Businesses and eligible individuals could

10     apply for PPP loans through May 31, 2021.

11             g.       In order to obtain a PPP loan, a qualifying business, independent

12     contractor/self-employed individual, or sole proprietorship was required to submit a PPP

13     loan application signed by an authorized representative of the business. The PPP loan

14     application required the applicant (through its authorized representative) to acknowledge

15     the program rules and make certain affirmative certifications in order to be eligible to obtain

16     the PPP loan. In the PPP loan application, the applicant (through its authorized

17     representative) was required to state, among other things, its: (a) average monthly payroll

18     expenses; and (b) number of employees. Applicants who did not have employees and who

19     filed an IRS Form 1040, Schedule C could report gross income instead of payroll. These

20     figures were used to calculate the amount of money the applicant was eligible to receive

21     under the PPP. In addition, businesses or sole proprietorships applying for a PPP loan were

22     required to provide documentation showing their eligibility and qualifying payroll amount.

23             h.       A participating financial institution (the lender) processed a PPP loan

24     application. If the lender approved a PPP loan application, it funded the PPP loan using its

1  own monies, which the Small Business Administration ("SBA") guaranteed 100%. If the

2  lender made a PPP loan to the applicant, the SBA paid the lender a processing fee, which

3  was calculated based on the amount of the loan. The lender transmitted information to the

4  Small Business Administration in the course of processing the loan data from the

5  application, including information about the borrower, the total amount of the loan, and the

6  listed number of employees. The SBA oversees the PPP, which has authority over all loans.

7  Over 5,000 lending institutions, mostly banks and credit unions, have participated in the

8  PPP.

9          i.       The business or individual receiving the PPP loan proceeds must

10  spend the funds on certain permissible expenses, such as payroll costs, interest on

11  mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to

12  be entirely forgiven if the loan proceeds are spent on permissible expense items within a

13  designated period of time and uses a specified portion of the PPP loan proceeds on payroll

14  expenses. When a PPP loan is forgiven, the SBA pays the lender the amount of the forgiven

15  interest and principal.

16                  Background Regarding the Economic Injury Disaster Loan Program

17          j.       The Economic Injury Disaster Loan ("EIDL") Program is a SBA

18  program that provides low-interest financing to small businesses, renters, and homeowners

19  in regions affected by declared disasters.

20          k.       Another source of relief provided by the CARES Act was the

21  authorization for the SBA to provide EIDLs of up to $2 million to eligible small businesses

22  experiencing substantial financial disruption due to the COVID-19 pandemic.  In addition,

23  the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses

24  within three days of applying for an EIDL.  The amount of the advance was determined by

10

1   the number of employees that the applicant certified it had.  The advances did not have to

2   be repaid.

3          l.        In order to obtain an EIDL and advance, a qualifying business is

4   required to submit an application to the SBA and provide information about its operations,

5   such as the number of employees, gross revenues for the 12-month period preceding the

6   disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case

7   of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020.

8   The applicant must also certify that all the information in the application is true and correct

9   to the best of the applicant's knowledge.

10         m.        EIDL applications are submitted directly to the SBA and processed

11  by the agency with support from a government contractor, Rapid Finance, via a server in

12  Des Moines, Iowa.  The amount of the loan, if the application was approved, was

13  determined based, in part, on the information provided by the application about

14  employment, revenue, and cost of goods, as described above.  Any funds issued under an

15  EIDL or advance are issued directly by the SBA.  EIDL funds can be used for payroll

16  expenses, sick leave, production costs, and business obligations, such as debts, rent, and

17  mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL funds

18  cannot be used for the same purpose as the PPP funds.

19                          Bailey's Scheme to Defraud

20         n.        Beginning in or around February 9, 2021, and continuing until in or

21  around August 25, 2021, within the state and federal district of Nevada and elsewhere,

22  Bailey, while in Bureau of Prison's ("BOP") custody, residing at the residential re-entry

23  center in Las Vegas, Nevada, and continuing while under United States Probation's

24  supervision in case number 2:21-cr-00208-GMN-DJA, did devise, intend to devise, and

11

1    participate in a scheme and artifice to defraud the SBA and Institutions 1, 2, and 3, and to

2    obtain money and property by means of materially false and fraudulent statements,

3    promises, misrepresentations and omissions, as further described below.

4                    o.         It was the purpose of the scheme for Bailey to unjustly enrich himself

5    and others by fraudulently obtaining loans, to which Bailey knew he was not entitled,

6    intended to help small businesses suffering economic harm caused by the COVID-19

7    pandemic. It was part of the scheme that from on or about February 9, 2021, through at

8    least June 18, 2021, Bailey submitted at least three fraudulent applications for EIDL funds

9    and at least two fraudulent applications for PPP loans via the internet. Bailey submitted

10   these applications electronically from Clark County, Nevada, and in doing so caused wire

11   communications to travel outside of Nevada.

12                   p.         Records from the SBA and Institutions 1, 2 and 3 show that in order

13   to qualify for these loans, Bailey submitted materially false and fraudulent information,

14   including that he was the sole proprietor of several companies which did not in fact exist,

15   reported false revenue amounts for each of those non-existent companies, and—for the

16   EIDL applications—reported a false number of employees of those non-existent

17   companies. In each of these applications, Bailey falsely certified either that he: (a) was only

18   going to spend loan monies on expenses specified under the programs' rules and not for

19   any unauthorized purpose, or (b) had not been convicted of a felony in the five years prior

20   to the applications' submissions or (c) a combination of both. These applications are

21   summarized in the table below.

22   / / /

23   / / /

24   / / /

12

| Date | Applicant Company | Type of Business | Gross Revenues | Number of Employees | Lender | Type of Loan Sought |
|------|------|------|------|------|------|------|
| February 9, 2021 | Arin Bailey | Eating and Drinking Place | $175,000 | 15 | SBA | EIDL |
| June 8, 2021 | ABs Health Care Services | Health Club | $119,575 | 11 | SBA | EIDL |
| June 18, 2021 | Abs Health Home Care Services | Health Services | $175,543 | 11 | SBA | EIDL |
| April 11, 2021 | Arin Bailey | Home Health Services | $119,500 | N/A | Institutions 1 and 2 | PPP |
| April 17, 2021 | Arin Bailey | Home Health Services | $119,500 | N/A | Institution 3 | PPP |

q.     The SBA did not grant any of Bailey's EIDL loan applications. Had the SBA approved and funded these loans, Bailey would have obtained approximately $508,500 in additional fraudulent Covid relief proceeds that he was not entitled to receive.

r.     Records from the Institutions also show that Bailey provided fake documentation in support of his PPP loan applications. Bailey attached an IRS Form 1040 Schedule C with his name and social security number purporting to show gross annual receipts of $119,500 for a home health services business. However, Bailey did not have such a business, and he had not filed—nor did he intend to subsequently file—this Schedule C form with the IRS. IRS records confirm that Bailey filed no such IRS Form.

s.     The PPP loans were approved. Bank records show that on or about April 28, 2021, Institutions 1 and 2 deposited approximately $20,833 into a Bank of America account, number ending in X-2361, which was controlled by Bailey. On or about May 28, 2021, Institution 3 deposited an additional approximately $20,833 into that same account. SBA paid $5,000 in fees during the course of these two loans issuing. Bailey was

13

1   not entitled to receive any of these PPP Covid-19 relief funds.

2   t.    Records from the Institutions 1 and 2 show Bailey applied via the

3   internet for forgiveness of Institution 1 and 2's $20,833 PPP loan on or about August 15,

4   2021. In the application, Bailey falsely certified that he had spent the loan money on

5   expenses specified under the PPP programs' rules and not for any unauthorized purpose,

6   when he knew that he spent the money for his own personal gain and for the benefit of

7   others and not for any authorized purpose. SBA subsequently forgave the loan, paying

8   Institutions 1 and 2 $20,833 on or about August 18, 202. SBA incurred additional fees

9   during the forgiveness process.

10  u.    The actual loss for Bailey's scheme to defraud is approximately

11  $47,000 and the intended loss is more than $550,000.

12  <u>The Charged Wire Communications</u>

13  v.    <u>Count One</u>: On or about June 8, 2021, Bailey, for the purpose of

14  executing the scheme and artifice to defraud, transmitted and caused to be transmitted, by

15  means of wire communication in interstate commerce, writings, signs, signals, pictures,

16  and sounds, that is, an EIDL loan application electronically transmitted by Bailey from

17  within Nevada to the SBA outside of Nevada, all in violation of Title 18 United States

18  Code, Section 1343.

19  **II.    ECF 28 - Petition for Warrant for Offender Under Supervision in case number
    2:21-cr-00208-GMN-DJA**

20

    <u>Violation: Must Report as Instructed</u>

21

22  w.    Bailey failed to report to his probation officer as directed. On

23  September 27, 2022, his probation officer attempted a home visit, but Bailey was not at

    home. Later, Bailey called the probation officer from a new phone number, and he was

24

    instructed to report to the probation office on September 28, 2022 prior to Bailey's meeting

scheduled that same day with his defense counsel. Bailey failed to report at any time on September 28, 2022.

x.    Bailey failed to report to the probation office on September 29, 2022 as directed.

y.    Bailey failed to report to the probation office on October 6, 2022 as directed.

**III.    August 14, 2023 Addendum in case number 2:21-cr-00208-GMN-DJA**

Violation: Do Not Commit Another Crime

z.    Bailey was arrested on or about January 11, 2023 in Chicago Illinois on felony charges of Possession of a Controlled Substance in violation of ILCS 570.0/402C (3 grams of crack cocaine), and Possession of Fraudulent Identification Card in violation of ILCS 335.0/14B-B1 (an Illinois Driver's License issued to victim W.L.D bearing Bailey's photograph).

Violation: Do Not Unlawfully Possess a Controlled Substance

aa.    On January 11, 2023, Bailey possessed 3 grams of crack cocaine.

Violation: Must Not Leave District

bb.    On January 11, 2023, Bailey was arrested in Chicago, Illinois, and he did not have permission to leave the state of Nevada.

## VI. SENTENCING FACTORS

13.    Discretionary Nature of Sentencing Guidelines: Defendant understands that in determining defendant's sentence, the district court is required to calculate the applicable sentencing guidelines range and to consider that range, possible departures under the sentencing guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a). Defendant understands that the sentencing guidelines are advisory only, that defendant

1  cannot have any expectation of receiving a sentence within the calculated sentencing

2  guidelines range, and that after considering the sentencing guidelines and the other

3  § 3553(a) factors, the district court will be free to exercise its discretion to impose any

4  sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

5       14.   <u>Offense Level Calculations</u>: The parties jointly agree and stipulate that, in

6  calculating defendant's advisory guidelines sentencing range, the Court should use the

7  following base offense level and adjustments; acknowledge that these stipulations do not

8  bind the district court; and agree that they will not seek to apply or advocate for the use of

9  any other base offense level(s) or any other specific offense characteristics, enhancements, or

10  reductions in calculating the advisory guidelines range:

11       Base Offense Level [USSG § 2B1.1(a)(1)]:       7

12       <u>Loss Exceeding $550,000 [USSG § 2B1.1(b)(1)(H)]:</u>     <u>+14     </u>

13            Adjusted Offense Level:     21

14       15.   <u>Reduction for Acceptance of Responsibility</u>: Under USSG § 3E1.1(a), the

15  USAO will recommend that defendant receive a two-level downward adjustment for

16  acceptance of responsibility unless defendant (a) fails to truthfully admit facts establishing a

17  factual basis for the guilty plea when defendant enters the plea; (b) fails to truthfully admit

18  facts establishing the amount of restitution owed when defendant enters the guilty plea; (c)

19  fails to truthfully admit facts establishing the forfeiture allegations when defendant enters

20  the guilty plea; (d) provides false or misleading information to the USAO, the Court,

21  Pretrial Services, or the Probation Office; (e) denies involvement in the offense or provides

22  conflicting statements regarding defendant's involvement or falsely denies or frivolously

23  contests conduct relevant to the offense; (f) attempts to withdraw defendant's guilty plea; (g)

24

1   commits or attempts to commit any crime; (h) fails to appear in court; or (i) violates the

2   conditions of pretrial release.

3          Under USSG § 3E1.1(b), if the district court determines that defendant's total offense

4   level before operation of § 3E1.1(a) is 16 or higher, and if the USAO recommends a two-

5   level downward adjustment pursuant to the preceding paragraph, the USAO will move for

6   an additional one-level downward adjustment for acceptance of responsibility before

7   sentencing because defendant communicated defendant's decision to plead guilty in a timely

8   manner that enabled the USAO to avoid preparing for trial and to efficiently allocate its

9   resources.

10          16.    Criminal History Category: Defendant acknowledges that the district court

11   may base defendant's sentence in part on defendant's criminal record or criminal history.

12   The district court will determine defendant's criminal history category under the sentencing

13   guidelines.

14          17.    Additional Sentencing Information: The stipulated sentencing guidelines

15   calculations are based on information now known to the parties. Defendant understands

16   that both defendant and the USAO are free to (a) supplement the facts in this agreement by

17   supplying relevant information to the U.S. Probation and Pretrial Services Offices and the

18   district court regarding the nature, scope, and extent of defendant's criminal conduct and

19   any aggravating or mitigating facts or circumstances; and (b) correct any and all factual

20   misstatements relating to the district court's sentencing guidelines calculations and

21   determination of sentence. While this paragraph permits both the USAO and defendant to

22   submit full and complete factual information to the U.S. Probation and Pretrial Services

23   Offices and the district court, even if that factual information may be viewed as inconsistent

24   with the facts agreed to in this agreement, this paragraph does not affect defendant's and the

17

1    USAO's obligations not to contest the facts agreed to in this agreement. Good faith efforts

2    to provide truthful information or to correct factual misstatements shall not be grounds for

3    defendant to withdraw defendant's guilty plea.

4            Defendant acknowledges that the U.S. Probation Office may calculate the sentencing

5    guidelines differently and may rely on additional information it obtains through its

6    investigation. Defendant also acknowledges that the district court may rely on this and other

7    additional information as it calculates the sentencing guidelines range and makes other

8    sentencing determinations, and the district court's reliance on such information shall not be

9    grounds for defendant to withdraw defendant's guilty plea.

10                   **VII. POSITIONS REGARDING SENTENCING**

11           18.    With respect to Count One of the Information, the government will

12   recommend that the district court vary downward three offense levels pursuant to 18

13   U.S.C. § 3553. The USAO and the defendant will jointly recommend that the district court

14   sentence defendant at the low end of the post-variance advisory guideline range as

15   determined by the district court, followed by a three-year term of supervised release.

16   Defendant will not, either explicitly or implicitly, argue for a downward departure or

17   variance from defendant's offense level or criminal history category. In agreeing to this

18   sentencing recommendation, the parties have taken into consideration all of the factors set

19   forth in 18 U.S.C. § 3553(a) and conclude that a post-variance low-end guideline sentence

20   is a reasonable sentence.

21           19.    In case number 2:21-cr-00208-GMN-DJA, the government and the

22   defendant will jointly recommend: (1) that the defendant's supervised release be revoked;

23   (2) that the district court sentence defendant to a 12-month custodial term; (3) that this

24

1    sentence run concurrent to any sentence of imprisonment imposed on Count One of the

2    Information; and (4) that no additional term of supervision should be imposed.

3        20.    Defendant acknowledges that the district court does not have to follow the

4    recommendation of either party.

5        21.    Notwithstanding its agreement to recommend a sentence as described above,

6    the USAO reserves its right to defend any lawfully imposed sentence on appeal or in any

7    post-conviction litigation.

8        22.    If defendant commits any act that results in the Court finding that defendant

9    is not entitled to a downward adjustment for acceptance of responsibility, the USAO is

10    entitled to argue for any sentence it deems appropriate under 18 U.S.C. § 3553(a).  In any

11    such event, Defendant remains bound by the provisions of this agreement and shall not

12    have the right to withdraw defendant's guilty plea.

13    **VIII. WAIVER OF CONSTITUTIONAL RIGHTS**

14        23.    Defendant understands that by pleading guilty, defendant gives up the

15    following rights:

16            a.    The right to persist in a plea of not guilty;

17            b.    The right to a speedy and public trial by jury;

18            c.    The right to be represented by counsel—and if necessary have the

19    court appoint counsel—at trial. Defendant understands, however, that, defendant retains the

20    right to be represented by counsel—and if necessary have the court appoint counsel—at

21    every other stage of the proceeding;

22            d.    The right to be presumed innocent and to have the burden of proof

23    placed on the USAO to prove defendant guilty beyond a reasonable doubt;

24            e.    The right to confront and cross-examine witnesses against defendant;

1        f.      The right to testify and to present evidence in opposition to the

2   charges, including the right to compel the attendance of witnesses to testify;

3        g.      The right not to be compelled to testify, and, if defendant chose not to

4   testify or present evidence, to have that choice not be used against defendant; and

5        h.      The right to pursue any affirmative defenses; Fourth Amendment or

6   Fifth Amendment claims; any other pretrial motions that have been or could have been

7   filed; and challenges to any adverse pre-trial rulings (unless specifically reserved in the

8   following section).

9                      **IX. WAIVER OF APPELLATE RIGHTS**

10       24.     Waiver of Appellate Rights: Defendant knowingly and expressly waives: (a)

11   the right to appeal any sentence imposed within or below the applicable Sentencing

12   Guideline range as determined by the district court; (b) the right to appeal the manner in

13   which the district court determined that sentence on the grounds set forth in 18 U.S.C. §

14   3742; and (c) the right to appeal any other aspect of the conviction, including but not limited

15   to the constitutionality of the statutes of conviction; any other aspect of the sentence,

16   including but not limited to the constitutionality of any mandatory or standard conditions of

17   supervised release; and any order of restitution or forfeiture.

18       25.     Defendant reserves only the right to appeal any portion of the sentence that is

19   an upward departure or variance from the applicable Sentencing Guideline range as

20   determined by the district court.

21       26.     Waiver of Post-Conviction Rights: Defendant also knowingly and expressly

22   waives all collateral challenges, including any claims under 28 U.S.C. § 2255, to defendant's

23   conviction, sentence, and the procedure by which the district court adjudicated guilt and

24   imposed sentence, except non-waivable claims of ineffective assistance of counsel.

20

27.     <u>Preservation of Evidence</u>: Defendant acknowledges that the USAO and the agencies investigating this case are not obligated or required to preserve any evidence obtained in the investigation of this case.

## XI. RESULT OF WITHDRAWAL OF GUILTY PLEA OR VACATUR/REVERSAL/SET-ASIDE OF CONVICTION

28.     <u>Consequence of withdrawal of guilty plea</u>: Defendant agrees that if, after entering guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, or that the government agreed to move to dismiss at sentencing as part of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

29.     <u>Consequence of vacatur, reversal, or set-aside</u>: Defendant agrees that if any count of conviction is vacated, reversed, or set aside, the USAO may: (a) ask the district court to resentence defendant on any remaining count of conviction, with both the USAO and defendant being released from any stipulations regarding sentencing contained in this agreement; (b) ask the district court to void the entire plea agreement and vacate defendant's guilty plea on any remaining count of conviction, with both the USAO and defendant being released from all their obligations under this agreement; or (c) leave defendant's remaining

conviction, sentence, and plea agreement intact. Defendant agrees that the choice among these three options rests in the exclusive discretion of the USAO, and that, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## XII. BREACH OF AGREEMENT

30.     Defendant agrees that if, at any time after this agreement becomes effective, defendant knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached. All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the district court finds such a breach to have occurred, then: (a) if defendant has previously entered guilty plea pursuant to this agreement, defendant will remain bound by the provisions of this agreement and will not be able to withdraw the guilty plea; and (b) the USAO will be relieved of all its obligations under this agreement.

31.     Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then:

a.     Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.     Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.     Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Federal Rule of Evidence 410, Federal Rule of Criminal Procedure 11(f), or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

## XIII. COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

32.    Defendant understands that the Court and the U.S. Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

33.    Defendant understands that both defendant and the USAO are free to argue on appeal and collateral review that the district court's sentencing guidelines calculations and the sentence it chooses to impose are not error.

34.     Defendant understands that even if the district court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to by the parties, or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one—not the prosecutor, defendant's attorney, or the Court—can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

## XIV. ADDITIONAL ACKNOWLEDGMENTS

35.     Defendant acknowledges that:

a.     Defendant read this agreement, and defendant understands its terms and conditions.

b.     Defendant had adequate time to discuss this case, the evidence, and this agreement with defendant's attorney.

c.     Defendant carefully and thoroughly discussed all terms of this agreement with defendant's attorney.

d.     Defendant understands the terms of this agreement and voluntarily agrees to those terms.

e.     Defendant has discussed with defendant's attorney the following: the evidence; defendant's rights; possible pretrial motions that might be filed; possible defenses that might be asserted either prior to or at trial; the sentencing factors set forth in 18 U.S.C. § 3553(a); the relevant sentencing guidelines provisions; and consequences of entering into this agreement.

1          f.    The representations contained in this agreement are true and correct,

2   including the factual basis for defendant's offense set forth in this agreement.

3          g.    Defendant was not under the influence of any alcohol, drug, or

4   medicine that would impair defendant's ability to understand the agreement when

5   defendant considered signing this agreement and when defendant signed it.

6   36.    Defendant understands that defendant alone decides whether to plead guilty

7   or go to trial, and acknowledges that defendant has decided to enter defendant's guilty plea

8   knowing of the charges brought against defendant, defendant's possible defenses, and the

9   benefits and possible detriments of proceeding to trial.

10  37.    Defendant understands that no promises, understandings, or agreements

11  other than those set forth in this agreement have been made or implied by defendant,

12  defendant's attorney, or the USAO, and no additional promises, agreements, or conditions

13  shall have any force or effect unless set forth in writing and signed by all parties or

14  confirmed on the record before the district court.

15  38.    Defendant acknowledges that defendant decided to plead guilty voluntarily

16  and that no one threatened, coerced, or forced defendant to enter into this agreement.

17  39.    Defendant is satisfied with the representation of defendant's attorney, and

18  defendant is pleading guilty because defendant is guilty of the charges and chooses to take

19  advantage of the promises set forth in this agreement and for no other reason.

20  **XV. PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING**

21  40.    The parties agree that this agreement will be considered part of the record of

22

23

24

25

1    defendant's guilty plea hearing as if the entire agreement had been read into the record of

2    the proceeding.

3

4    AGREED AND ACCEPTED

5

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE DISTRICT OF NEVADA

7    JASON M. FRIERSON
     United States Attorney

8

9     /s/ Kimberly M. Frayn                              11/07/2023
      KIMBERLY M. FRAYN                                   Date
10    Assistant United States Attorney

11

12                                                       11 - 7 - 23
      ARIAN ANTHONY BAILEY                               Date
13    Defendant

14                                                       11 - 7 - 23
15    BRIAN PUGH                                          Date
      Assistant Federal Public Defender
16    Attorney for Defendant ARIAN ANTHONY
      BAILEY

17

18

19

20

21

22

23

24

**EXHIBIT A**
**Form of One-Count Information**
**Charging Defendant Bailey**

THE UNITED STATES ATTORNEY CHARGES THAT:

At all times relevant to this Information:

Introduction

a.    Defendant Arian Anthony Bailey ("Bailey") was a United States citizen residing in Las Vegas, Nevada.

b.    In June 2016, Bailey was arrested by state law enforcement. In August 2016, Bailey was indicted on felony drug and gun offenses, in *United States v. Arian Bailey*, case number 16CR520-1, in the United States District Court for the Northern District of Illinois. In February 2017, Bailey was convicted of several federal felonies, including one Class A felony, and he was sentenced to imprisonment. Bailey remained in continuous custody until he was released to the residential re-entry center in Las Vegas, Nevada, in December 2020.

c.    Bailey was also ordered to serve three years of supervised release as part of his 2017 sentence.  Bailey commenced supervision in Nevada on April 30, 2021. Bailey is currently under United States Probation's supervision, in case number 2:21-cr-00208-GMN-DJA, after jurisdiction was transferred from Illinois to Nevada in July 2021.

d.    Institution 1 was a non-bank lender headquartered in Lake Mary, Florida. Institution 2 was a commerce platform that provided apps, APIs, marketing, and financial tools to help businesses. Institution 1 partnered with Institution 2 to participate as a lender in the Paycheck Protection Program ("PPP").

e.    Institution 3 was a hard money lender headquartered in Coral Gables, Florida. Institution 3 participated as a PPP lender.

1        <u>Background Regarding the Paycheck Protection Program</u>

2            f.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act

3    is a federal law enacted in or around March 2020 and is designed to provide emergency

4    financial assistance to the millions of Americans who are suffering the economic effects

5    caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was

6    the authorization of up to $349 billion in forgivable loans to small businesses and sole

7    proprietorships for job retention and certain other expenses, through a program referred to

8    as the Paycheck Protection Program ("PPP"). Subsequent legislation provided additional

9    funding for the PPP and extended its duration. Businesses and eligible individuals could

10   apply for PPP loans through May 31, 2021.

11           g.      In order to obtain a PPP loan, a qualifying business, independent

12   contractor/self-employed individual, or sole proprietorship was required to submit a PPP

13   loan application signed by an authorized representative of the business. The PPP loan

14   application required the applicant (through its authorized representative) to acknowledge

15   the program rules and make certain affirmative certifications in order to be eligible to obtain

16   the PPP loan. In the PPP loan application, the applicant (through its authorized

17   representative) was required to state, among other things, its: (a) average monthly payroll

18   expenses; and (b) number of employees. Applicants who did not have employees and who

19   filed an IRS Form 1040, Schedule C could report gross income instead of payroll. These

20   figures were used to calculate the amount of money the applicant was eligible to receive

21   under the PPP. In addition, businesses or sole proprietorships applying for a PPP loan were

22   required to provide documentation showing their eligibility and qualifying payroll amount.

23           h.      A participating financial institution (the lender) processed a PPP loan

24   application. If the lender approved a PPP loan application, it funded the PPP loan using its

1  own monies, which the Small Business Administration ("SBA") guaranteed 100%. If the

2  lender made a PPP loan to the applicant, the SBA paid the lender a processing fee, which

3  was calculated based on the amount of the loan. The lender transmitted information to the

4  Small Business Administration in the course of processing the loan data from the

5  application, including information about the borrower, the total amount of the loan, and the

6  listed number of employees. The SBA oversees the PPP, which has authority over all loans.

7  Over 5,000 lending institutions, mostly banks and credit unions, have participated in the

8  PPP.

9                 i.        The business or individual receiving the PPP loan proceeds must

10  spend the funds on certain permissible expenses, such as payroll costs, interest on

11  mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to

12  be entirely forgiven if the loan proceeds are spent on permissible expense items within a

13  designated period of time and uses a specified portion of the PPP loan proceeds on payroll

14  expenses. When a PPP loan is forgiven, the SBA pays the lender the amount of the forgiven

15  interest and principal.

16                 Background Regarding the Economic Injury Disaster Loan Program

17                 j.        The Economic Injury Disaster Loan ("EIDL") Program is a SBA

18  program that provides low-interest financing to small businesses, renters, and homeowners

19  in regions affected by declared disasters.

20                 k.        Another source of relief provided by the CARES Act was the

21  authorization for the SBA to provide EIDLs of up to $2 million to eligible small businesses

22  experiencing substantial financial disruption due to the COVID-19 pandemic.  In addition,

23  the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses

24  within three days of applying for an EIDL.  The amount of the advance was determined by

1  the number of employees that the applicant certified it had.  The advances did not have to

2  be repaid.

3          l.     In order to obtain an EIDL and advance, a qualifying business is

4  required to submit an application to the SBA and provide information about its operations,

5  such as the number of employees, gross revenues for the 12-month period preceding the

6  disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case

7  of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020.

8  The applicant must also certify that all the information in the application is true and correct

9  to the best of the applicant's knowledge.

10          m.     EIDL applications are submitted directly to the SBA and processed

11  by the agency with support from a government contractor, Rapid Finance, via a server in

12  Des Moines, Iowa.  The amount of the loan, if the application was approved, was

13  determined based, in part, on the information provided by the application about

14  employment, revenue, and cost of goods, as described above.  Any funds issued under an

15  EIDL or advance are issued directly by the SBA.  EIDL funds can be used for payroll

16  expenses, sick leave, production costs, and business obligations, such as debts, rent, and

17  mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL funds

18  cannot be used for the same purpose as the PPP funds.

19                       Bailey's Scheme to Defraud

20          n.     Beginning in or around February 9, 2021, and continuing until in or

21  around August 25, 2021, within the state and federal district of Nevada and elsewhere,

22  Bailey, while in Bureau of Prison's ("BOP") custody, residing at the residential re-entry

23  center in Las Vegas, Nevada, and continuing while under United States Probation's

24  supervision in case number 2:21-cr-00208-GMN-DJA, did devise, intend to devise, and

30

1   participate in a scheme and artifice to defraud the SBA and Institutions 1, 2, and 3, and to

2   obtain money and property by means of materially false and fraudulent statements,

3   promises, misrepresentations and omissions, as further described below.

4           o.     It was the purpose of the scheme for Bailey to unjustly enrich himself

5   and others by fraudulently obtaining loans, to which Bailey knew he was not entitled,

6   intended to help small businesses suffering economic harm caused by the COVID-19

7   pandemic. It was part of the scheme that from on or about February 9, 2021, through at

8   least June 18, 2021, Bailey submitted at least three fraudulent applications for EIDL funds

9   and at least two fraudulent applications for PPP loans via the internet. Bailey submitted

10   these applications electronically from Clark County, Nevada, and in doing so caused wire

11   communications to travel outside of Nevada.

12           p.     Records from the SBA and Institutions 1, 2 and 3 show that in order

13   to qualify for these loans, Bailey submitted materially false and fraudulent information,

14   including that he was the sole proprietor of several companies which did not in fact exist,

15   reported false revenue amounts for each of those non-existent companies, and—for the

16   EIDL applications—reported a false number of employees of those non-existent

17   companies. In each of these applications, Bailey falsely certified either that he: (a) was only

18   going to spend loan monies on expenses specified under the programs' rules and not for

19   any unauthorized purpose, or (b) had not been convicted of a felony in the five years prior

20   to the applications' submissions or (c) a combination of both. These applications are

21   summarized in the table below.

22   / / /

23   / / /

24   / / /

31

| Date | Applicant Company | Type of Business | Gross Revenues | Number of Employees | Lender | Type of Loan Sought |
|------|-------------------|------------------|----------------|---------------------|--------|---------------------|
| February 9, 2021 | Arin Bailey | Eating and Drinking Place | $175,000 | 15 | SBA | EIDL |
| June 8, 2021 | ABs Health Care Services | Health Club | $119,575 | 11 | SBA | EIDL |
| June 18, 2021 | Abs Health Home Care Services | Health Services | $175,543 | 11 | SBA | EIDL |
| April 11, 2021 | Arin Bailey | Home Health Services | $119,500 | N/A | Institutions 1 and 2 | PPP |
| April 17, 2021 | Arin Bailey | Home Health Services | $119,500 | N/A | Institution 3 | PPP |

q.     The SBA did not grant any of Bailey's EIDL loan applications. Had the SBA approved and funded these loans, Bailey would have obtained approximately $508,500 in additional fraudulent Covid relief proceeds that he was not entitled to receive.

r.     Records from the Institutions also show that Bailey provided fake documentation in support of his PPP loan applications. Bailey attached an IRS Form 1040 Schedule C with his name and social security number purporting to show gross annual receipts of $119,500 for a home health services business. However, Bailey did not have such a business, and he had not filed—nor did he intend to subsequently file—this Schedule C form with the IRS. IRS records confirm that Bailey filed no such IRS Form.

s.     The PPP loans were approved. Bank records show that on or about April 28, 2021, Institutions 1 and 2 deposited approximately $20,833 into a Bank of America account, number ending in X-2361, which was controlled by Bailey. On or about May 28, 2021, Institution 3 deposited an additional approximately $20,833 into that same account. SBA paid $5,000 in fees during the course of these two loans issuing. Bailey was not entitled to receive any of these PPP Covid-19 relief funds.

t.      Records from the Institutions 1 and 2 show Bailey applied via the internet for forgiveness of Institution 1 and 2's $20,833 PPP loan on or about August 15, 2021. In the application, Bailey falsely certified that he had spent the loan money on expenses specified under the PPP programs' rules and not for any unauthorized purpose, when he knew that he spent the money for his own personal gain and for the benefit of others and not for any authorized purpose. SBA subsequently forgave the loan, paying Institutions 1 and 2 $20,833 on or about August 18, 202. SBA incurred additional fees during the forgiveness process.

u.      The actual loss for Bailey's scheme to defraud is approximately $47,000 and the intended loss is more than $550,000.

### The Charged Wire Communication

23.      On or about June 8, 2021, in the State and District of Nevada and elsewhere,

**ARIAN ANTHONY BAILEY,**

defendant herein, for the purpose of executing the scheme and artifice to defraud, transmitted and caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, that is, an Economic Injury Disaster Loan application electronically transmitted by Bailey from Las Vegas, Nevada to the SBA outside of Nevada, all in violation of Title 18, United States Code, Section 1343.